**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JAMES M. SHADEK,**

    **Plaintiff,**

 **v.**

           **Case No.: 6:24-cv-950-RBD-UAM**

**TAMARA S. KIDD,**

    **Defendant,**

_____

**REPORT AND RECOMMENDATION**

This cause comes before the Court on Plaintiff James M. Shadek's Renewed Motion for Final Default Judgment (the "Motion"), filed on February 13, 2025. (Doc. 20). In the Motion, Plaintiff seeks a default judgment against Defendant Tamara S. Kidd after Defendant failed to respond to the Amended Complaint. The Amended Complaint alleged elder abuse, fraudulent misrepresentation, fraudulent inducement, civil theft, and promissory estoppel. (Doc. 9, ¶ 1). On April 2, 2025, an evidentiary hearing under Rule 55 was held. The Motion is due to be granted in part and denied in part.

## I. BACKGROUND[1]

### A. Factual Allegations

---

[1] On default, a defendant admits the well-pleaded allegations of fact in the complaint. *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009).

Defendant Kidd contacted Plaintiff Shadek regarding stock purchases around the year 2013. (Doc. 9, ¶ 7). Plaintiff Shadek was an investment professional, (Doc. 9, ¶ 8), and Defendant Kidd was employed by an entity called The Ritman Agency, which Plaintiff alleges was a "pump and dump firm." (Doc. 9, ¶ 7, n.1). Plaintiff and Defendant subsequently developed a friendship over email and telephone, never meeting in person. (Doc. 9, ¶ 12).

Beginning in 2016, Defendant "began emailing Plaintiff persuading Plaintiff to transfer to her large sums of money." (Doc. 9, ¶ 17). According to the Amended Complaint, Plaintiff transferred $7,700 to Defendant in 2016, $120,000 in 2017, $370,000 in 2019, "over $100,000" in 2020, and $330,000 in 2021. (Doc. 9, ¶ 19). In 2024, Plaintiff transferred $14,000 to Defendant. (Doc. 9, ¶ 21).

In 2020, Plaintiff began to experience a significant decline in his health after being diagnosed with arthritis and ultimately losing kidney function due to renal complications. Plaintiff was eventually placed on dialysis and received 24-hour home care. Plaintiff "began to experience loneliness and his mental health declined." Plaintiff then "leaned on his 'friendship' with Defendant to fill the void of isolation he experienced from his declining health." In addition to the 24-hour home care Plaintiff was receiving, a friend of Plaintiff's family ("the family friend") began to take care of Plaintiff. From March 2023 to about February 2024, the family friend took care of Plaintiff's personal matters, such as paying his bills, checking his

emails, and monitoring his financial accounts. (Doc. 9, ¶¶ 13, 14, 15, 25, 26).

According to the Amended Complaint, Defendant manipulated Plaintiff by claiming that she was suffering a number of dire circumstances, such as needing money to take care of her children, escape her abusive partner, and pay her bills. (Doc. 9, ¶ 22). The requests for money became more urgent. For example, Defendant began to call and email Plaintiff, saying that she had wrecked her vehicle and could not get it fixed unless Plaintiff sent her money. (Doc. 9, ¶ 36). Another time, Defendant called Plaintiff and told him that she was stranded on an island with her daughter. (Doc. 9, ¶ 39).

Defendant told Plaintiff that she needed money to purchase a home now that she was a single parent. Plaintiff and Defendant signed loan documents wherein Defendant promised that she would pay Plaintiff back between $850,000 and $1,300,000 at a 2.1% to 3% interest rate. (Doc. 9, ¶ 34). These loan documents were not attached to the Amended Complaint as exhibits.

Plaintiff eventually became frustrated because Defendant continued to ask for money, postponed the time period of making her payments, or made excuses as to why she could not immediately begin paying Plaintiff back. (Doc. 9, ¶ 40). To date, Defendant has "not paid back any money, nor has she returned any of the property she purchased with the funds she received from Plaintiff through her deceptive actions." (Doc. 9, ¶ 42). Plaintiff alleges that the exhibit attached to the Amended

Complaint shows that "for the past seven years, Defendant has managed to obtain about $8,054,216.00 from Plaintiff." (Doc. 9, ¶ 20).

An evidentiary hearing was held on April 2, 2025. There, Plaintiff's Counsel confirmed that Plaintiff is seeking the full $8,054,216 in damages. Prior to the hearing, Plaintiff submitted additional affidavits. (Docs. 22, 23, 24, 25, 28) containing statements by various individuals associated with Plaintiff and an affidavit of attorney's fees. Notably, due to his physical and mental health conditions, Plaintiff did not personally participate in the hearing on the Motion.

## B. Procedural History

On May 23, 2024, Plaintiff James M. Shadek filed a Complaint against Defendant Tamara S. Kidd alleging elder abuse, fraudulent misrepresentation, fraudulent inducement, civil theft, and promissory estoppel. (Doc. 1, ¶ 1). On May 28, 2024, the Court *sua sponte* dismissed Plaintiff's Complaint without prejudice with leave to file an amended complaint. (Doc. 8). Plaintiff's Amended Complaint was filed on May 28, 2024, alleging identical causes of action as in his initial Complaint. (Doc. 9). Plaintiff was seeking a judgment against Defendant "for (a) an amount no less than $8,000,000, (b) statutory interest under the applicable rates under Florida law, (c) punitive damages as warranted under Fla. Stat. 415.1111, and (d) Plaintiff's attorneys' fees for having to bring this action, and (e) any other relief that this Court deems just and equitable." (Doc. 9 at 14).

On July 22, 2024, Plaintiff moved for an Entry of Clerk's Default against Defendant. (Doc. 14). This Court granted that motion, (Doc. 15), and the Clerk entered a Default against Defendant Kidd on August 28, 2024.

Plaintiff filed a Motion for Default Judgment against Defendant Kidd on October 2, 2024. (Doc. 17). On January 23, 2025, this Court denied without prejudice Plaintiff's Motion for a Default Judgment. (Doc. 19). The Court noted a number of problems with Plaintiff's motion. First, Plaintiff's motion relied solely on the entry of the Clerk's default and Federal Rule of Civil Procedure 55(b)(1) in support of its request for a default judgment, providing no analysis as to the elements of the claims asserted in the Amended Complaint. (Doc. 19 at 2–3). Second, Plaintiff's affidavit referred to a "document of indebtedness" that was not attached to the motion, and the amounts alleged in the affidavit did not add up to the $8.054 million allegedly obtained from Plaintiff through false pretenses. (Doc. 19 at 3). Lastly, Plaintiff's request for attorney's fees was deficient as Plaintiff's counsel had submitted a summary of hours and rates without any explanation of the tasks or any support for the hourly rate to be charged. (Doc. 19 at 3–4).

Plaintiff filed the instant Renewed Motion for Final Default Judgment on February 13, 2025. (Doc. 20). On April 2, 2025, an evidentiary hearing under Rule 55 was held wherein Plaintiff submitted further affidavits and bank statements. Defendant has not responded to the Motion, and the time for doing so has expired.

*See* Local Rule 3.01(c).

## II.    STANDARD

A district court may enter a default judgment against a properly served defendant who fails to defend or otherwise appear. Fed. R. Civ. P. 55(b)(2). The mere entry of a default by the Clerk does not, in itself, warrant the Court's entering a default judgment. *See Tyco Fire & Sec. LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007). Rather, a defaulted defendant is only deemed to admit the plaintiff's well-pled allegations of fact. *Id.* "Thus, before entering a default *judgment* for damages, the district court must ensure that the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a substantive cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought." *Id.* (emphasis in original).

The Supreme Court has explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This analysis applies equally in the context of motions for default judgment. *De Lotta v. Dezenzo's Italian Rest., Inc.*, No. 6:08-cv-2033-Orl-22KRS, 2009 WL 4349806, at *5 (M.D. Fla. Nov. 24, 2009) (citations omitted).

"Once liability is established, the court turns to the issue of relief." *Enpat, Inc. v. Budnic,* 773 F. Supp. 2d 1311, 1313 (M.D. Fla. 2011). "Pursuant to Federal Rule of Civil Procedure 54(c), '[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings,' and a court may conduct hearings when it needs to determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter." *Id.* (citing Fed. R. Civ. P. 55(b)(2).) Where all the essential evidence is of record, an evidentiary hearing on damages is not required. *SEC v. Smyth,* 420 F.3d 1225, 1232 n.13 (11th Cir. 2005).

## III.  DISCUSSION

### A. Service of Process

The Proof of Service affidavit reflects that Defendant Kidd was personally served on June 7, 2024, (Doc. 13), making service effective under Federal Rule of Civil Procedure 4(e)(2)(A). Subsequently, the Clerk issued a default against her. (Doc. 16).

### B. Jurisdiction

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of diverse states and the amount in controversy exceeds $75,000. (Doc. 9, ¶¶ 4–6). The Court has personal jurisdiction over Defendants because Defendant Kidd lives in Orange County, Florida. (Doc. 9, ¶ 3). Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(1) because a substantial

part of the events giving rise to the cause of action occurred in the Orlando Division of the Middle District of Florida. (Doc. 9, ¶ 3).

### C. Liability

#### 1. Elder Abuse Under Section 415.1111, Fla. Stat.

Under Count I, Plaintiff alleges that he is a vulnerable adult and that Defendant exploited him under Florida state law. (Doc. 9 at 9–10). The Court finds that there is not a "sufficient basis in the pleadings" for relief. *See Tyco Fire & Sec. LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007).

Pursuant to the applicable statute:

> A vulnerable adult who has been abused, neglected, or exploited as specified in this chapter has a cause of action against any perpetrator and may recover actual and punitive damages for such abuse, neglect, or exploitation. The action may be brought by the vulnerable adult, or that person's guardian, by a person or organization acting on behalf of the vulnerable adult with the consent of that person or that person's guardian, or by the personal representative of the estate of a deceased victim without regard to whether the cause of death resulted from the abuse, neglect, or exploitation.

§ 415.1111, Fla. Stat.

A "vulnerable adult," is defined as "a person 18 years of age or older whose ability to perform the normal activities of daily living or to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the

infirmities of aging." § 415.102(28), Fla. Stat. "Activities of daily living" means "functions and tasks for self-care, including ambulation, bathing, dressing, eating, grooming, toileting, and other similar tasks." § 4153.102(2), Fla. Stat.

"Exploitation" means a person who:

1.  Stands in a position of trust and confidence with a vulnerable adult and knowingly, by deception or intimidation, obtains or uses, or endeavors to obtain or use, a vulnerable adult's funds, assets, or property with the intent to temporarily or permanently deprive a vulnerable adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the vulnerable adult; or

2.  Knows or should know that the vulnerable adult lacks the capacity to consent, and obtains or uses, or endeavors to obtain or use, the vulnerable adult's funds, assets, or property with the intent to temporarily or permanently deprive the vulnerable adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the vulnerable adult."

§ 415.102(8)(a)1-2, Fla. Stat.

"Capacity to consent" means "that a vulnerable adult has sufficient understanding to make and communicate responsible decisions regarding the vulnerable adult's person or property." § 415.102(4), Fla. Stat.

In the instant Motion, Plaintiff argues that "Plaintiff has outlined that at all relevant times, Plaintiff was a vulnerable adult over the age of eighteen (18) with a long-term disability and unable to perform the normal activities of daily life due to

his disability." However, the Amended Complaint makes clear that Plaintiff's health began to decline in 2020. (Doc. 9, ¶ 13). The Amended Complaint does not clearly state that Defendant had been experiencing health issues prior to 2020. The affidavits of Michele Slaff and Larry Shadek state that Plaintiff began experiencing renal failure in the latter part of 2022, which necessitated the around-the-clock caretaker. (Doc. 22 ¶ 4) (Doc. 24 ¶ 5). Plaintiff was diagnosed with Asperger's Syndrome in March of 2023. (Doc. 22 ¶ 8) (Doc. 22–5).

The Affidavit of Michele Slaff, (Doc. 22), Plaintiff's around-the-clock caretaker, states that, of all the years knowing Mr. Shadek and the Shadek family, Slaff "always knew Mr. Shadek to be a very intellectual person. However, it was always known amongst the family that socially, Mr. Shadek was different." (Doc. 22, ¶ 7). According to Slaff, Plaintiff's Asperger's Syndrome renders Mr. Shadek "socially handicapped." (Doc. 22 ¶ 8). Mr. Shadek does not maintain conversations normally and finds it difficult to understand the flow of conversation. (Doc. 22 ¶ 10). Because of his social difficulties, Plaintiff resorted to having Slaff "communicate [Plaintiff's] needs and wants on a daily basis for essentially all aspects of his life." (Doc. 22 ¶ 11). Larry Shadek, Plaintiff's brother, submitted an affidavit that is virtually identical to Slaff's affidavit. (Doc. 24).

Plaintiff alleges exploitation as defined under § 415.102(8)(a)2, stating that "Defendant knew or should have known that Plaintiff lacked the capacity to consent,

but Defendant exploited Plaintiff by fraudulently obtaining or using, or endeavoring to fraudulently obtain or use, Plaintiff's funds, assets, or property, with the intent to temporarily or permanently deprive Plaintiff of the use, benefit, or possession of his funds, assets, or property for the benefit of someone other than Plaintiff." (Doc. 9, ¶ 49) (Doc. 20 at 4, 5).

Plaintiff did not show that he lacked the capacity to consent. While there were facts alleged regarding Plaintiff's arthritis, lost kidney function, loneliness, and Asperger's, there were no facts directly alleged that Plaintiff was unable to make or communicate responsible decisions regarding himself or his property. *See* § 415.102(4), Fla. Stat. Rather, the pleadings and affidavits tend to show that Plaintiff's Asperger's made for a difficult social life. Perhaps Plaintiff was more susceptible to being a victim of a financial crime than the average individual, but the pleadings do not show that Plaintiff lacked the capacity to consent under the statute. For these reasons, the undersigned recommends the Court deny Plaintiff's Motion regarding Count I.

### 2. Fraudulent Misrepresentation and Fraudulent Inducement

There are four elements of fraudulent misrepresentation and fraudulent inducement: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting

in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (quoting *Johnson v. Davis,* 480 So.2d 625, 627 (Fla. 1985)); *see Dziegielewski v. Scalero*, 352 So. 3d 931, 934 (Fla. 5th DCA 2022) (recognizing elements apply to both fraudulent inducement and fraudulent misrepresentation).

The undersigned concludes that Plaintiff has adequately pleaded a claim for relief for fraudulent misrepresentation and fraudulent inducement. Defendant made statements that she would pay back Plaintiff (Doc. 9 ¶ 24) and would pay him back with interest (Doc. 9 ¶ 24). Defendant continuously gave dire reasons for borrowing extravagant sums of money, such as to "take care of her children, escape her abusive partner, and pay her bills" (Doc. 9 ¶ 22). In one instance, Defendant called Plaintiff in a "frenzy" and told him that she was on an island for business with her daughter but had become stranded because Plaintiff did not send her the money she requested. (Doc. 9 ¶ 39). Defendant spoke to Plaintiff in a "very flirtatious and alluring manner, typically accompanied by requests for large sums of money." (Doc. 22 ¶ 19). Plaintiff postponed any time period for paying back the money she borrowed and made excuses as to why she could not begin paying Plaintiff back. (Doc. 9 ¶ 40).

Plaintiff's last contact with Defendant was March 16, 2024, where "Plaintiff told [Defendant] Kidd that he was no longer loaning her any money and that she needed to begin to pay back the money, as she had previously promised." (Doc. 9 ¶ 41). To date, Defendant has not paid back any money, nor has she returned any items

she may have purchased with the funds she received from Plaintiff. (Doc. 9 ¶ 41). Plaintiff "had always been adamant that he did not give Defendant any money but that he 'lent' her money due to the promises she made to him, despite having never received a single dollar in repayment to date." (Doc. 22 ¶ 27).

Based on the pleadings, Defendant made numerous false statements with the intention of repeatedly inducing Plaintiff to transfer vast sums of money to Defendant. Plaintiff suffered a hefty financial injury in his reliance on Defendant's statements that she would pay Plaintiff back any money that was borrowed. The undersigned concludes that Plaintiff has adequately pleaded claims of fraudulent misrepresentation and fraudulent inducement and recommends the Court grant Plaintiff's Motion as to Count II.

### 3. Civil Theft

Plaintiff alleges under Count III of the Complaint that "Defendant knowingly obtained monies from [Plaintiff] with the intent to permanently deprive Plaintiff of such" and that "Defendant exhibited felonious intent through her conniving tactics and manipulation by concocting dire circumstances and carefully crafted explanations to justify her repeated requests for copious sums of money, laced with the promise to return the funds knowing full well that she intended to repay nothing." (Doc. 1 ¶¶ 60, 61).

Under Florida law, a plaintiff can obtain "treble damages if he proves by clear and convincing evidence that he has been injured by the defendant's violation of Section 812.014, Florida Statutes – the criminal theft statute." *Omnipol, a.S. v. Worrell*, 421 F. Supp. 3d 1321, 1346 (M.D. Fla. 2019) (citing Fla. Stat. § 772.11(1)). In a civil theft claim, "the plaintiff must allege an injury resulting from a violation of the criminal theft statute." *Id.* Under Florida's criminal theft statute, the plaintiff must allege the defendant: "(1) knowingly (2) obtained or used, or endeavored to obtain or use, the plaintiff's property with (3) 'felonious intent' (4) either temporarily or permanently to ... appropriate the property to the defendant's own use or the use of another." *Id.*; *United States v. Bailey*, 288 F. Supp. 2d 1261, 1265 (M.D. Fla. 2003), *aff'd*, 419 F.3d 1208 (11th Cir. 2005). "In order to establish an action for civil theft, the claimant must prove the statutory elements of theft, as well as criminal intent." *Gersh v. Cofman*, 769 So. 2d 407, 409 (Fla. 4th DCA 2000) (citing *Country Manors Ass'n v. Master Antenna Sys., Inc.,* 534 So.2d 1187, 1191 (Fla. 4th DCA 1988)).

Before filing an action for damages under § 772.11, F.S., the statute providing a civil remedy for theft, "the person claiming injury must make a written demand for $200 or the treble damage amount of the person liable for damages under this section. If the person to whom a written demand is made complies with such demand within 30 days after receipt of the demand, that person shall be given a written

release from further civil liability for the specific act of theft or exploitation by the person making the written demand."

Because there is no allegation that Plaintiff sent the pre-suit demand required by § 772.11, F.S., in either the Complaint or the instant Motion, the instant Motion must be denied as to Count III of the Complaint.

### 4. Promissory Estoppel

Generally stated, promissory estoppel is "[t]he principle that a promise made without consideration may nonetheless be enforced to prevent injustice if the promisor should have reasonably expected the promisee to rely on the promise and if the promisee did actually rely on the promise to his or her detriment." Black's Law Dictionary 631 (9th ed. 2009). As the definition indicates, promissory estoppel traditionally serves as an exception to the requirement of consideration in the formation of a contract. *See Se. Sales & Serv. Co. v. T.T. Watson, Inc.,* 172 So.2d 239, 241 (Fla. 2d DCA 1965).

The elements of promissory estoppel "are set out in section 90 of the Restatement (Second) of Contracts, which provides: [1] A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and [2] which does induce such action or forbearance is binding if [3] injustice can be avoided only by enforcement of the promise." *DK Arena, Inc. v. EB Acquisitions I, LLC*, 112 So. 3d 85 (Fla. 2013) (citing *W.R. Grace*

*and Co. v. Geodata Serv., Inc.,* 547 So.2d 919, 924 (Fla.1989) (adopting the Restatement definition of promissory estoppel)). "Only detrimental reliance which causes a substantial change in position will constitute sufficient consideration to support promissory estoppel." *Robinson v. SunTrust Mortg., Inc.*, 785 F. App'x 671, 678 (11th Cir. 2019) (citation omitted). "For promissory estoppel to be applicable, the evidence must be clear and convincing and show a substantial inducement that would justify the application of this principle." *Lozano v. Marriott Corp.*, 844 F. Supp. 740, 743 (M.D. Fla. 1994) (citing *W.R. Grace and Co. v. Geodata*, 547 So. 2d 919 (Fla. 1989)). The Florida Supreme Court has rejected the use of promissory estoppel as an exception to the Statute of Frauds. *Tanenbaum v. Biscayne Osteopathic Hospital, Inc.,* 190 So.2d 777, 779 (Fla. 1966).

Courts have rejected the application of promissory estoppel when the promise is "not definite but, on the contrary . . . entirely indefinite as to terms and time." *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924 (Fla. 1989) (quoting *Hygema v. Markley,* 187 So. 373, 380 (1939)).

In the instant case, the Complaint lists a number of times where Defendant tells Plaintiff that she will pay Plaintiff back the funds Plaintiff has transferred to her. For example, "Defendant would memorialize the transactions by emailing Plaintiff, acknowledging that she was receiving the money from Plaintiff and that she would pay back the money, sometimes even promising to pay the money back

with interest." (Doc. 9 ¶ 24). Plaintiff continues: "Defendant signed loan documents, along with Plaintiff, promising that she would pay Plaintiff back between $850,000 and $1,300,000 at a 2.1% to 3% interest rate." (Doc. 9 ¶ 34). "Defendant would continue to swindle large sums of money from Plaintiff, telling him that she promised to pay him back while justifying her deceptive actions with sob stories and excuses . . . ." (Doc. 9 ¶ 35). "Plaintiff began to become frustrated with Defendant because she continued to ask for money, postponed the time period of making her payments, or made excuses as to why she could not immediately begin paying him back." (Doc. 9 ¶ 40).

Based off of what is contained in the pleadings, the agreements for Defendant to pay back Plaintiff are "indefinite as to terms and time." *See W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924 (Fla. 1989) (quoting *Hygema v. Markley,* 187 So. 373, 380 (1939)). The "loan documents" mentioned in the Amended Complaint and submitted as "Exhibit E" with the affidavit of Michele Slaff (Doc. 22–5), wherein Defendant promised that she would pay Plaintiff back at various interest rates, are too indefinite to support relief under a theory of promissory estoppel.[2]

---

[2] For example, on page 3 of "Exhibit E," Defendant writes on a piece of notebook paper that she will pay Plaintiff "$1,795,400 plus a [sic] interest rate of 2.5% until I transfer property to him located in Fort Lauderdale, FL. Valued at 3.5 million." (Doc. 22–5 at 3). Another document from 2019 states that the "Borrower promises to repay the lender $877,300 on a schedule to be agreed

For the above reasons, the undersigned recommends that Plaintiff's Motion be denied as to Count IV.

### D. Damages

Plaintiff is seeking $8,054,216.00 (Doc. 9 ¶ 20) in damages for money given to Defendant from January of 2016 to March 2024. (Composite Exhibit "A" with Doc. 25). Plaintiff sent physical checks to Defendant and transferred funds electronically via Zelle. (Composite Exhibit "A" with Doc. 25).

Plaintiff submitted the affidavit of Luanne Eisenburg, who is the Client Services Supervisor to Plaintiff for accounts he holds with his employer, Wellington Shields. (Doc. 25). Eisenburg reviewed the bank statements and records submitted by Plaintiff and found them to be authentic and accurately reflecting the amounts transferred from Plaintiff to Defendant Kidd. (Doc. 25 ¶¶ 7, 8).

The undersigned concludes that Plaintiff has sufficiently pled claims of fraudulent inducement and fraudulent misrepresentation under Count II for the time period January 2016 to March 2024. The undersigned recommends the Court award Plaintiff the requested damages of $8,054,216.00.

### E. Attorney's Fees

---

upon at a later date. The interest on any outstanding balance will be 3%." (Doc. 22–5 at 4).

Federal Rule of Civil Procedure 54(d) allows for the prevailing party to claim attorney's fees and costs. Here, Plaintiff submitted an Amended Affidavit of Attorney's Fees and Expenses prior to the hearing held on April 1, 2025. (Doc. 29). Plaintiff states that 53.4 hours have necessarily been expelled by attorneys and legal assistants and/or paralegals of the firm in representing the Plaintiff in this action. (Doc. 29). Attorney Abbye Alexander has practiced for 21 years and charged $400 an hour for 23.8 hours of work. Attorney Shaquirah Dixon has practiced for 3 years and charged $275 an hour for 27.8 hours. Finally, paralegal Melissa Cruz charged $120 an hour for 1.8 hours of work performed. The fees and costs Plaintiff seeks is $17,381.00 and expenses of $828.80, for a total of $18,209.80. (Doc. 29 at 2). Given the experience of Plaintiff's attorney, the hourly rates awarded within the district, the complexity of this matter, and in the absence of opposition, a substantial billable rate is appropriate.

Counsel's timesheets reflect work performed on the entire case rather than distinguishing between the four separate claims. Because the Plaintiff did not prevail on Counts I, III and IV, the Court must determine a fair adjustment to account for unproductive effort. Because counsel did not record separate entries for the various claims and being mindful that all the causes of action sought relief for the same underlying activity by the Defendant, it is impractical to single out individual time

entries for disallowance. Instead, a small adjustment is recommended, recognizing how the preparation and presentation of the case were intertwined.

Consdidering the matter as whole, then, the Court finds that an award of $15,000 appropriately recognizes the legal effort reasonably necessary to file this action and bring it to judgment. **Accordingly, a fee award of $15,000 is recommended.**

### F. RECOMMENDATION

The undersigned respectfully recommends that the Court:

1. **GRANT IN PART** Plaintiff's Motion for Default Judgment against Defendant Tamara S. Kidd (Doc. 9).

2. **FIND** that Plaintiff is entitled to damages amounting to $8,054,216, plus attorney's fees of $15.000.00 and costs of $828.80.

3. **DIRECT** the Clerk to enter final judgment in Plaintiff's favor against Defendant Tamara S. Kidd in the total amount of $8,070,044.80 and thereafter **CLOSE** the case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on April 29, 2025.

_David A. Baker_
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties